**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**EASTERN DIVISION**

**NATIONWIDE MUTUAL FIRE INSURANCE**
**COMPANY, as Subrogee of Shirley's of Collins, LLC**　　　　　　　　　　**PLAINTIFF**

**VS.**　　　　　　　　　　　　　　　**CIVIL ACTION NO. 2:21-cv-34-KS-MTP**

**INTERFACE SECURITY SYSTEMS, LLC**　　　　　　　　　　　　**DEFENDANT**

**MEMORANDUM OPINION AND ORDER**

This cause comes before the Court on Defendant's Motion for Summary Judgment [74]. The motion is fully briefed and is ripe for ruling. Having considered the parties' submissions, the relevant legal authority, and otherwise being duly advised in the premises, the Court finds that, for the reasons set forth below, the motion will be granted in part and denied in part.

**I. BACKGROUND**

**A. Facts**

This case is a dispute over liability relating to a burglary and fire loss. On September 4, 2001, Shirley's of Collins ("Shirley's") and Phillips-Doby Security Systems, Inc. entered into a written alarm services agreement titled "Lease Agreement" ("2001 Agreement"), whereby Phillips-Doby agreed to install, maintain, and monitor a burglar system at Shirley's located at 3450 Highway 49 North, Collins, Mississippi for a fee of $47.95 (excluding tax) per month (recurring monthly revenue or "RMR"). [74-1]. Tammy White, the owner of Shirley's, signed the 2001 Agreement on behalf of Shirley's. [74-2] at 59:12-60:11.

The 2001 Agreement states, "This contract shall be in force and effect for a period of 36 months from the date of this contract and thereafter until cancelled by either party hereto as herein provided." [74-1] at ¶ 7; [78-3] at 21:23-22:2; [78-2] at 38:2-5. Paragraph 9 of the 2001 Agreement states in full as follows:

It is understood and agreed that contractor is not an insurer, that insurance, if any shall be obtained by Subscriber, that the payments provide for herein are based solely on the value of the services as set forth herein and are unrelated to the value of the Subscriber's property or the property of others located on Subscribers premises; that Contractor makes no guarantee or warranty, including any implied warranty of merchantability or fitness that the equipment or services supplied will avert or prevent occurrences or the consequences there from [sic] which the system or service is designed to detect or avert. Subscriber acknowledges it is impractical and extremely difficult to fix the actual damages, if any, which may proximately result from failure to perform any of the obligations herein, or the failure of the system to properly operate with resulting loss to Subscriber because of, among other things: (a) uncertain amount of value of Subscriber's property or the property of others kept on the premises which may be lost, stolen, destroyed, damaged or otherwise by occurrences which the system or services is designed to detect or avert; (b) The uncertainty of the response time of any police or fire department, should the police or fire department [be] dispatched as a result of a signal being received or an audible device sounding; (c) The inability to ascertain what portion, if any, of the loss would be proximately caused by Contractors failure to perform or by failure of its equipment to operate; (d) The nature of the service to be performed by the Contractor.

Subscriber understands and agrees that if Contractor should be found liable for loss or damage due from a failure of Contractor to perform any of the obligations herein, including but not limited to installation, maintenance, monitoring or service or the failure of the system or equipment in any respect whatsoever, Contractor's liability shall be limited to Two Hundred Fifty ($250.00) Dollars, as liquidated damages and not as a penalty and this liability shall be exclusive and that the provision of this Section shall apply if loss or damage, irrespective of cause or origin, results directly or indirectly to persons or property from performance or non-performance of the obligations imposed by this contract, or from negligence, active or otherwise, its agents, assigns or employees.

[74-1] at ¶ 9.[1] From the time of the 2001 Agreement up until the fire, Shirley's paid a service fee every month. [74-2] 136:14-20.

In 2004, Interface executed a Stock Purchase Agreement with Phillips-Doby and acquired all of Phillips-Doby's installation and monitoring agreements, which included the 2001 Agreement executed by Shirley's. [74-3]; [74-4] 28:18-31:5; 33:16-34:13. Once Interface acquired the contract, Shirley's never attempted to cancel the security service. [81-1] 75:5-12. For eighteen

---

[1] The Agreement also states that it is governed by the laws of the State of Mississippi. [74-1] at ¶ 14.

years, between the two companies, the service that was provided to Shirley's was never canceled, and service was never disrupted. [81-1] 86:18-20; 117:9-118:21.

In 2008, "open/close reports" were added to the Shirley's account by means of an Interface Addendum RMR ("Addendum") dated January 14, 2018.[2] [74-2] at 75:15-20; [74-5]. The Addendum provided, "This Addendum to Client Agreement Name/Number <u>Shirley's</u> dated <u>9-4-01</u> . . . ." and "This Agreement renews the original contract dated <u>9-4-01</u> for a new term of <u>12 mos.</u>" [74-5]. The Addendum also states, "Subject to terms and conditions outlined in Client Agreement." *Id.*

In March 2016, Ms. White added a fire alarm to the existing system by means of an Interface "Addendum/Customer Change Order" (the "2016 Addendum"). [74-2] at 79:11-24; [74-6].[3] Interface installed a combination burglar/fire control panel and added fire-protection equipment, as well as cellular backup monitoring. [74-6]; [78-3] 51:8-52:16; 52:22-53:11; 54:9-15. The 2016 Addendum states, "This agreement renews the original contract dated 01/04 for the new term of 60 months." [74-6] at p. 1. It also states, "Subject to terms and conditions outlined in Client Agreement." *Id.* Interface's Melanie Regan, who prepared the 2016 Addendum, testified that she erred and transposed numbers in the date and that there is no contract between the parties executed in January 2004.[4] [81-2] 48:17-24; [74-11] 82:23-83:9. Ms. White does not recall signing any agreement for Shirley's with Interface or Phillips-Doby in January 2004. [81-1] 86:6-22.

---

[2] "Opening and closing reports are the signals sent by an alarm panel to indicate the system has been disarmed (opening) or armed (closing). The terms carry over from the days when businesses were the primary users of alarm systems, and it was necessary to know when a store opened and closed each day."
https://www.home-security-systems-answers.com/opening-and-closing-reports.html (accessed 1/25/2023).
[3] The Addendum/Change Order is dated March 3, 2016, but Ms. White signed it on March 13, 2016 according to the electronic signatures. [74-6].
[4] Melanie Regan was the regional Interface account manager whose responsibilities included submission of contract documents to customers for review and execution. [78-3] at 14:11-22. She signed and prepared the 2016 Addendum on behalf of Interface. [81-2] 46:18-47-5; 48:11-16.

On March 10, 2019, Shirley's was burglarized and the building set on fire. [74-7] at ¶ 10. On or about the above date, Shirley's held an insurance policy with Nationwide, which provided building, business personal property, and business interruption coverage. *Id.* at ¶¶ 1, 12; [74-2] 49:4-6. Nationwide compensated Shirley's under the policy for the losses sustained in the March 10, 2019 incident. [74-7] at ¶ 12; [74-2] at 52:16-22.[5]

**B. Procedural History**

On March 3, 2021, Nationwide filed this subrogation action against Interface alleging, not any breach of contract claims, but rather only claims of negligence/gross negligence, breach of implied warranties of merchantability and fitness for a particular purpose, and negligent and intentional misrepresentation. [1] at ¶¶ 14-31. On April 30, 2021 Interface filed a Motion to Dismiss,  attaching a document purported to be a contract that controlled this action and required dismissal. [6].  However, the attached contract had no connection to the Shirley's location at issue here, and Interface withdrew its Motion. [12]. Thereafter, on September 15, 2021, Interface filed a Motion for Judgment on the Pleadings [30] based upon other contract documents attached to its Amended Answer, which the Court denied by Order dated October 26, 2021. [44]. The Court found that judgment on the contract was outside the scope of a Rule 12(b)(6) motion because the contract was not referenced in the Complaint, and the Court declined to convert the motion to one for summary judgment. *Id.* at pp. 3-4.

Because the parties disagreed about the existence and effect of the Phillips-Doby and Interface contracts, the parties filed a Joint Motion to Bifurcate Discovery Issues and Stay Pre-Trial Deadlines [50], wherein the parties requested that the Court bifurcate discovery into two

---

[5] Nationwide represents it has a subrogated interest in the amount of $4,789,116.18 in damages paid. [79] at p. 4.

phases: discovery into the existence of a contract and discovery as to damages, which the Court granted. [55]. The Court ordered a "contract-based discovery" deadline of April 1, 2022 and gave Interface an April 15, 2022 deadline to file a motion for summary judgment "related to any contract." *Id.* The Court further ordered that all remaining case deadlines would be reset following the Court's disposition of Defendant's motion for summary judgment. *Id.*

## II. DISCUSSION

Interface seeks summary judgment on the grounds that the limitation of liability provision in the 2001 Agreement applies to limit Nationwide's recovery on its claims in this case. [75] at p. 2.  Interface then argues that, despite any such provision, Nationwide's negligence claims fail because it cannot establish that Interface had a duty independent of the contract to support such claims. Next, Interface posits that Nationwide's breach of implied warranty claims are deficient because the transaction between Shirley's and Interface, or its predecessor, was for the provision of services and did not involve a sale of goods. Finally, Interface argues that Nationwide cannot show that any misrepresentations were made or that Shirley's relied upon any misrepresentation.

In response, Nationwide argues that any contractual limitation of liability is either immaterial, ambiguous, or unenforceable as a matter of law. Regardless of the contractual questions, Nationwide argues that it also has valid warranty, gross negligence, and misrepresentation claims against Interface that must remain pending.

### A. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party bears the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the

absence of a genuine issue of material fact." *Nola Spice Designs, LLC v. Haydel Enters., Inc*., 783 F.3d 527, 536 (5th Cir. 2015). After a proper motion for summary judgment is made, the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986); *Allen v. Rapides Parish School Bd.*, 204 F.3d 619, 621 (5th Cir. 2000); *Ragas v. Tenn. Gas Pipeline Co*., 136 F.3d 455, 458 (5th Cir. 1998).

A genuine dispute of material fact is one that could affect the outcome of the action or allow a reasonable fact finder to find in favor of the non-moving party. *Gorman v. Verizon Wireless Tex., LLC*, 753 F.3d 165, 170 (5th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). A court views the facts and evidence in the light most favorable to the non-moving party at all times. *Plumhoff v. Rickard*, 572 U.S. 765, 768 (2014). A court should not weigh the evidence. *Wheat v. Fla. Par. Juvenile Justice Comm'n*, 811 F.3d 702, 713 (5th Cir. 2016). A credibility determination may not be part of the summary judgment analysis. *EEOC v. LHC Grp., Inc*., 773 F.3d 688, 694 (5th Cir. 2014).

**B. Analysis**

There is no dispute that the 2001 Agreement at issue is a one-page document that contains a provision which, if valid and enforceable, would limit Interface's liability to $250 in the event that Shirley's [Nationwide] seeks to hold Interface liable for a loss incurred by Shirley's. Thus, the main issues to be decided are whether the 2001 Agreement was still in effect at the time of the fire and whether it is an enforceable agreement. Before the Court performs its legal analysis in that regard, it first needs to address Nationwide's initial argument.

Nationwide first argues that the terms of the 2001 Agreement are immaterial because it has not sued on the contract, only on tort and implied warranty theories.[6] The Court readily dispenses with this argument, as this is a subrogation action. Nationwide, as subrogee to Shirley's, "steps into the shoes of the subrogor and obtains only those rights possessed by the subrogor and assigned to the subrogee." *Ellis v. Powe*, 645 So. 2d 947, 951 (Miss. 1994) (citing *St. Paul Prop. & Liab. Ins. Co. v. Nance*, 577 So. 2d 1238, 1240-41 (Miss. 1991)). Regardless of the theories pled, because Nationwide stands in the shoes of Shirley's, if the limitation of liability provision set forth in Paragraph 9 of the 2001 Agreement would limit Shirley's recovery, it also limits Nationwide's recovery. Had Shirley's brought the claim, it would not be able to circumvent the terms of a contract by simply suing in tort, particularly when the limitation clause appears to apply to all liability, including Interface's negligence.[7] *Cf. Ginsberg v. Lennar Fla. Holdings, Inc.*, 645 So. 2d 490, 494 (Fla. 3d DCA 1994) ("Where damages sought in tort are the same as those for breach of contract a plaintiff may not circumvent the contractual relationship by bringing an action in tort."). Therefore, if the 2001 Agreement was in effect and enforceable, the limitation of liability could apply to tort as well as contract theories.

  1. **The 2001 Agreement Was in Effect at the Time of the Fire.**

    a. **The 2001 Agreement was a Valid Contract Put Into Effect on September 4, 2001.**

"The existence of a contract and its terms are questions of fact to be resolved by the fact-finder, whether a jury or a judge in a bench-trial." *Houston v. Willis*, 24 So. 3d 412, 417 (Miss. Ct. App. 2009) (quoting *Gandy v. Est. of Ford*, 17 So. 3d 189, 192 (¶ 6) (Miss. Ct. App. 2009). There

---

[6] Because of its status as subrogee, Nationwide's complaint that Interface is attempting to enforce a limitation-of-liability provision included in a contract "that it was not a party to" is of no legal consequence.

[7] Paragraph 9 states in part that "this Section shall apply if loss or damage, irrespective of cause or origin, results directly or indirectly to persons or property from . . . negligence, active or otherwise . . . ."

is no dispute in this case that Shirley's procured a security system from Phillips-Doby on September 4, 2001. On that date, Shirley's entered into the 2001 Agreement prepared by Phillips-Doby and signed by Tammy White, whereby Phillips-Doby agreed to furnish and install the original security system and provide related services for a fee of $47.95 (excluding tax).[8] [79] at p. 2; [74-1]; [74-2] 59:12-60:11. Thus, the 2001 Agreement is the original contract that began Phillips-Doby's, and eventually Interface's, relationship with Shirley's. [81-1] 89:7-19.[9]

The 2001 Agreement states that it "shall be in full force and effect for a period of 36 months from the dated of this contract and thereafter until cancelled by either party hereto as herein provided." [74-1]. Ms. White testified that from the time of the 2001 Agreement up until the 2019 fire, Shirley's paid a service fee every month. [74-2] 136:14-20. Once Interface acquired the contract in 2004, Shirley's never attempted to cancel the security service. [81-1] 75:5-12. For eighteen years, between the two companies, the service that was provided to Shirley's was never canceled, and service was never disrupted. [81-1] 86:18-20; 117:9-118:21.

Based on the foregoing undisputed facts, the Court finds that the 2001 Agreement was a valid contract, and had there been no other writings between the parties,[10] this would surely be the parties' governing contract and the terms and conditions would be in full force and effect.[11] However, there is no dispute that Shirley's subsequently signed two additional Interface documents, namely the 2008 Addendum, and the 2016 Addendum/Customer Change Order. [74-

---

[8] Based on the totality of the evidence reviewed, it appears that the "security system" that Phillips-Doby provided included a burglar alarm system and monitoring.

[9] There is also no dispute that pursuant to the Stock Purchase Agreement, Interface acquired all of the installation and monitoring agreements of Phillips-Doby, which included the 2001 Agreement executed by Shirley's of Collins. [74-3] 33:16-34:13.

[10] Nationwide points to testimony that indicates that if it were a monitored system at that time, there would have been a monitoring agreement, but none has been produced. [79] at p. 7. This does not raise a material issue of fact. Without such an agreement in the record, the import of such is mere speculation. There is no evidence presented that would show that such monitoring agreement would have altered the terms and conditions set forth in the 2001 Agreement itself.

[11] There is still the question of enforceability, which will be addressed *infra*.

5]; [74-6]; [81-1] 75:15-76:4; 79:13-80:9. Thus, the question now becomes, and the gravamen of Nationwide's arguments in opposition, what effect did those two documents have on the 2001 Agreement?  Put another way, did the parties intend for the 2001 Agreement's terms and conditions to remain in effect?

> **b.  The 2001 Agreement Remained in Effect After the 2008 Addendum and the 2016 Addendum.**

Ms. White testified that in 2008 she requested open/close reports be added to the services Interface was providing to Shirley's. [81-1] 75:15-76:18. The document that was signed on January 14, 2008 is titled Addendum to RMR. [74-5]. There is also no dispute that in 2016, Ms. White requested that a fire alarm system and other services be added. [81-1] 13-24. The document that was signed on March 13, 2016 is titled Addendum/Customer Change Order. [74-6].  The issues to be decided with regard to these additional documents is whether they are completely new agreements that either superseded or cancelled the 2001 Agreement or whether they are subject to the terms of the 2001 Agreement.

"Questions concerning the construction of contracts are questions of law that are committed to the court rather than questions of fact committed to the fact finder." *Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc.*, 857 So. 2d 748 (Miss. 2003). The Mississippi Supreme Court has set out a three-tiered approach to contract interpretation. *Facilities, Inc. v. Rogers-Usry Chevrolet, Inc.*, 908 So. 2d 107, 111 (Miss. 2005). It has stated:

> Legal purpose or intent should first be sought in an objective reading of the words employed in the contract to the exclusion of parole or extrinsic evidence. First, the "four corners" test is applied, wherein the reviewing court looks to the language that the parties used in expressing their agreement . . . . to determine how to interpret it. When construing a contract, we will read the contract as a whole, so as to give effect to all of its clauses. Our concern is not nearly so much with what the parties may have intended, but with what they said, since the words employed are by far the best resource for ascertaining the intent and assigning meaning with fairness and accuracy. Thus, the courts are not at liberty to infer intent contrary to that

emanating from the text at issue. On the other hand, if the contract is unclear or ambiguous, the court should attempt to "harmonize the provisions in accord with the parties' apparent intent." Only if the contract is unclear or ambiguous can a court go beyond the text to determine the parties' true intent. "[T]he mere fact that the parties disagree about the meaning of a contract does not make the contract ambiguous as a matter of law."

*Id.* (internal citations omitted).

### i.  The 2008 Addendum

In examining the 2008 Addendum, we begin with its title—"Addendum to RMR." The legal definition of "addendum" is "[s]omething that is added, usu. to a document; esp., a supplement to a speech, book, contract, or other document to alter its contents of give more information." Black's Law Dictionary at p. 45 (10th ed. 2014). Not only does the title use the word addendum, but the document clearly states, "This Addendum to Client Agreement Name/Number Shirley's dated 9-4-01," which manifests a clear intent that an earlier contract dated 9-4-01 is being amended. Although it is called a "Client Agreement" the date comports with the date of the "Lease Agreement," which is indisputably dated 9-4-01. There is no evidence in the record of any other contract between the parties titled "Client Agreement," and certainly not with that date. Therefore, the Court concludes that the Client Agreement referred to is the 2001 Agreement.

Additionally, the 2008 Addendum states that it "renews the *original contract* dated 9-4-01 for a new term of 12 months." [74-5] (emphasis added). This again refers to the 2001 Agreement, as it was the "original contract" that began the relationship between the parties and is indisputably 9-4-01. Further, the document states, "Add open close reports" and indicates that the RMR amount would increase by $7.00. This clearly shows that the previous RMR was for the existing service, i.e., the burglar alarm and monitoring, and the addition of the open/close reports would cost an additional $7.00 per month.

Finally, the Addendum states "Subject to the terms and conditions outlined in the Client Agreement." Having found that the Client Agreement is the 2001 Agreement, the 2008 Addendum thereby incorporated its terms and conditions. "Where a writing refers to another document, that other document, or the portion to which reference is made, becomes constructively part of the writing and in that respect the two form a single instrument." Williston on Contracts, § 30:25 (4th ed. 1999).

Nationwide argues by extending the agreements only for a "new term" of 12 months, the 2008 Addendum between Shirley's and Interface, along with any applicable terms, expired on January 14, 2009. [79] at p. 3. Having found that the 2008 Addendum incorporated the terms of the 2001 Agreement, if a contract incorporates another document by reference, then both documents must be read together to give full effect to the intent of the parties. *Galey v. World Mktg. All*., 510 F.3d 529, 532 (5th Cir. 2007) (citing *United Miss. Bank v. GMAC Mortgage Co*., 615 So. 2d 1174, 1176 (Miss. 1993)). The parties intended under the 2001 Agreement that it would be for a term of 36 months and "thereafter until cancelled by either party." Reading the 2008 Addendum together with 2001 Agreement, the Court finds that the "term" of the 2008 Addendum would continue as well until cancelled by either party.

Another reasonable interpretation reading the two agreements together is that the stated term is the obligatory period for which the parties are bound and no cancellation could occur. Thus, with the 2001 Agreement, Shirley's was obligated to pay for 36 months and could continue thereafter until cancelled. Likewise, with the open/close reports, Shirley's was obligated to receive the reports and pay the additional $7.00 for at least 12 months. After that 12 months, Shirley's could keep the burglar alarm system and cancel just the open/close reports or cancel both.

Notwithstanding the Court's interpretation, to the extent this new 12-month term creates an ambiguity, it may be explained, but not contradicted, by extrinsic evidence. *See Lambert v. Miss. Limestone Corp.*, 405 So. 2d 131, 133 (Miss. 1981) (finding no error in allowing parole evidence to explain or clarify ambiguous terms). Here, the parties' course of dealing supports the Court's interpretation. There is no dispute that, although the parties agreed in the 2001 Agreement to an original term of 36 months, Shirley's did not stop paying after September 2004. Rather Shirley's continued to pay a service fee (RMR) for another three years and four months until January 2008, when it added the open/close reports. With the new RMR, it is undisputed that Shirley again did not stop paying after January 2009 but continued to pay for Interface's services up until the time of the fire. There is simply no evidence to support that any of the agreements expired. As Interface points out, if the parties' contract expired in 2009, then what was being performed from 2009 until 2016? Reading both agreements together, with the terms that had been incorporated, and in light of the parties' performance, it is clear that the parties intended the contracts for the burglar alarm system and the open/close reports to continue until either party cancelled. Nothing was to expire, and nothing did expire in January 2009.

### ii. The 2016 Addendum

A little over eight years after the open/close reports were added, another addendum, titled Addendum/Customer Change Order, was executed on March 13, 2016. Nationwide argues that when the parties entered into the 2016 Addendum, the Change Order then became the operative contract because it was essentially a new system, and it does not contain a limitation of liability clause. [79] at pp. 6 ¶ 9, 14. However, Nationwide offers no admissible evidence in support of

such statement.[12] Contrary to Nationwide's assertions, the Court finds the 2016 Addendum was not a "new contract" because, like the 2008 Addendum, it is unambiguous. It merely added additional equipment and services and effectively incorporated the terms of the 2001 Agreement.

With regard to it being a new system and a completely new contract, the language contained in the document, the evidence, and the testimony lead to the opposite conclusion. In 2016, Ms. White admits that she requested that smoke alarms be added. [81-1]: 13-14. To effectuate that change, the parties entered into the 2016 Addendum. The Court again starts with the title— "Addendum/Customer Change Order." As with the 2008 Addendum, such title implies it is an addition or change to an already existing contract. The language in the opening line, also similar to the 2008 Addendum, which states, "This Addendum to Client Agreement Name SHIRLEY'S," makes clear that it is an addition to an existing agreement.

The additions come in Exhibit A to the 2016 Addendum titled "Schedule of Equipment" that lists several items, which included a commercial fire and burglary control panel, hardwired smoke detectors, a siren, a backup battery, a cellular communicator, and a GSM communicator. [74-6] at p. 3; [78-3] 51:11-15, 52:11-16. There is no dispute that Shirley's had an existing burglar alarm system and that when adding the fire protection system, an upgrade to a completely new control panel was necessary to handle both the burglar alarm and fire alarm systems. [78-3] 51:13-52:8. Interface testified that the original burglar alarm equipment that was there remained, along

---

[12] Nationwide submitted testimony from Ms. Regan that the purchase of the new security system and related services required execution of a *new* agreement between Interface and Shirley's. [79] at 14. However, that is not quite what she stated. She testified because Shirley's was adding some new equipment and services to what it already had, Interface had to have an agreement with Shirley's for the purchase of the new equipment and the related monthly service fees. [78-3] 3:-18. This does not raise an issue of material fact, as the 2016 Addendum is technically a new agreement. The legal import of that "new agreement" is for the Court to decide. Nationwide also relies on the fact that after the fire, when Ms. White requested a copy of the "contract," the 2016 Addendum was the only agreement emailed to her. Contract interpretation uses an objective standard. *Simmons v. Bank of Mississippi*, 593 So. 2d 40, 42 (Miss. 1992) (citing *Cherry v. Anthony, Gibbs, Sage*, 501 So. 2d 416 (Miss.1987)). A parties' subjective belief about "what the operative contract is" is irrelevant. The same can be said for the testimony of Interface's Kenneth Obermeyer when he opined that the 2016 Addendum "does not reference the original lease agreement, no." [78-6] at 95:5-10.

with the intrusion alarm monitoring, all of which had been in place since 2001. [78-3] 52:17-21. [78-6] 92:15-20.[13] Finally, the 2016 Addendum lists the existing monthly fee as $68.45 and shows an increase of $22.12, for a new total monthly fee of $90.57. All of the foregoing makes clear that it is not an entirely new contract, but only a change to an existing one.

As to its effect on the 2001 Agreement, the language of the 2016 Addendum unambiguously shows the parties intent. Although in a different format, similar to the 2008 Addendum, the 2016 Addendum states, "This agreement renews the original contract dated 01/04" for the new term of 60 months."[14]  As before, the reference to the "original contract," would seem to imply the 2001 Agreement; however, the date is not stated 9-4-01 but rather "01/04." Nationwide argues that the "01/04" reference causes an ambiguity that creates an issue of fact. However, the mere reference does not raise an issue of fact because Nationwide has not submitted evidence of another agreement that bears such a date, nor date similar, such that it would be up to a jury to determine whether the parties actually meant the 9-4-01 Agreement or the 01/04 Agreement.[15] Thus, there is no issue of fact surrounding the ambiguity.

To the extent the "01/04" reference itself creates some ambiguity, then the Court may resort to extrinsic evidence. *Lambert*, 405 So. 2d at 133. Ms. Regan, who prepared the 2016 Addendum

---

[13] There is no evidence that the burglar alarm service was terminated or the equipment returned, and Nationwide raises no issue of material fact as to this existing equipment and services being in place in 2016 and remaining thereafter. These are simply objective facts and are not used as extrinsic evidence to explain a particular term or contract provision.

[14] As before, a reasonable interpretation of the new 60-month term is Shirley's was obligated to keep the fire alarm equipment and services in place and pay the adjusted monthly fee for at least 60 months. Thereafter, she could cancel some or all of the services.

[15] As to Nationwide's argument that an ambiguity in meaning of a contact must be resolved in favor of the non-moving party on summary judgment, again Nationwide has not created an issue of fact to be resolved in its favor. In support of that legal proposition, Nationwide cites *Burton v. Choctaw Cnty.*, 730 So. 2d 1 (Miss. 1997). However, *Burton* involved the interpretation of the word "treatment" contained the contract. *Id*. at 4. The parties submitted two conflicting affidavits as to what that word should mean. *Id.* Here, there is no conflicting evidence about the meaning of "01/04" other than speculation. Similarly, Nationwide's emphasis on the undefined contract numbers "03298" and "10407558" (handwritten) on in Exhibit A to the 2016 Addendum is of no moment. After significant discovery, there has been no evidence submitted that would raise an issue of fact.

testified that she erred by transposing numbers in the date and that there is no contract between the parties executed on 01/04. Likewise, Ms. White testified that she does not recall signing anything in 2004. "A written contract should be construed according to the obvious intention of the parties, notwithstanding clerical errors or inadvertent omissions therein, which can be corrected by perusing the whole instrument." *Robinson v. Martel Enterprises*, *Inc.,* 337 So. 2d 698, 701 (Miss. 1976). "If an improper word has been used or a word omitted, the court will strike out the improper word or supply the omitted word if from the context it can ascertain what word should have been used." *Id.* Because the Court has found that there was one original contract, with two addenda, "a written instrument must be considered as a whole and all parts construed together." *Texaco, Inc. v. Kennedy*, 271 So. 2d 450, 452 (Miss. 1973). Given the 9-4-01 date of the original contract and the reference in the 2008 Addendum to the 'original contract dated 9-4-01," the Court finds that the "01/04" reference should have read "9/04/01." Thus, the parties' intended the 2016 Addendum to be just that, a further change to the original contract dated 9-4-01.

Likewise, when construing all of the documents together, having found that the 2008 Addendum's reference to "Client Agreement . . .dated 9-4-01" clearly referred to the 2001 Agreement, when the 2016 Addendum states, that it is "[s]ubject to terms and conditions outlined in Client Agreement," it is referring to the 2001 Agreement. As such, the Court again finds this sufficient to incorporate the terms of the 2001 Agreement into the 2016 Addendum.

Based on the foregoing, there being no genuine issues of material fact, the Court finds that the two addendums only modified the original contract pertaining to the security system at Shirley's. The two addenda to the 2001 Agreement did not change the validity or effectiveness of the terms of the 2001 Agreement, as both incorporated all of the terms and conditions therein, including the limitation of liability provision. Because the original 2001 Agreement was never

cancelled, the Court finds the 2001 Agreement, along with its terms and conditions, remained in effect from September 4, 2001 up until the time of the fire.

### 2.   The 2001 Agreement Is Enforceable.

Nationwide argues that if the Court determines that the 2001 Agreement is applicable, it is unenforceable because it is substantively unconscionable in that it is a contract of adhesion. [79] at p. 22. The Court disagrees. Also, for the reasons below, the Court finds that the 2001 Agreement is not void as to public policy, and the Mississippi Supreme Court would enforce the limitation of liability provision.

### a.  The 2001 Agreement is not substantively unconscionable.

The party challenging the enforceability of the agreement bears the burden of showing that it is unconscionable. *Smith v. Express Check Advance of Miss*., *LLC*, 153 So. 3d 601, 608 (Miss. 2014). In Mississippi, an unconscionable contract is "one such as no man in his senses and not under a delusion would make on the one hand, and as no honest and fair man would accept on the other." *Id.* (internal quotation omitted). Contracts of adhesion are not automatically unconscionable. Nonetheless, the Mississippi Supreme Court has held that a finding that a contract is adhesive "makes an argument targeting a provision for a substantive unconscionability review easier to prove." *Caplan Enterprises, Inc. v. Arrington*, 145 So. 3d 608, 615 (Miss. 2014) (quoting *Covenant Health & Rehab. of Picayune, LP v. Est. of Moulds ex rel. Braddock*, 14 So. 3d 695, 701 (Miss. 2009)).[16]

An adhesion contract is offered on a take "'take-it-or-leave-it' basis to the weaker party who has no real opportunity to bargain about its terms." *Express Check*, 153 So. 3d at 608.

---

[16] Interestingly, in other cases the court has said that a contract of adhesion is a sign of *procedural* unconscionability. *See, e.g., Virgil v. Sw. Miss. Elec. Power Ass'n*, 296 So. 3d 53, 62 (Miss. 2020); *East Ford, Inc. v. Taylor*, 826 So. 2d 709, 716 (Miss. 2002). Nationwide does not argue that the 2001 Agreement is procedurally unconscionable.

Nationwide offers a variety of reasons why it believes the 2001 Agreement is a contract of adhesion. First, Nationwide points to the fact that it is on a pre-printed form drafted unilaterally by Phillips-Doby in small, non-bolded, inconspicuous print on a take-it-or-leave-it basis with terms that unfairly favored Phillips-Doby. Again, the Court disagrees.

It is true the 2001 Agreement is a pre-printed form drafted by Phillips-Doby, and the Court acknowledges that the court in *Arrington* noted that adhesion contracts "are usually prepared in printed form, and frequently at least some of their provisions are in extremely small print." *Arrington*, 145 So. 3d at 615. However, the limitation of liability clause is not inconspicuous or "buried in the fine print," as they say, because the font utilized in the 2001 Agreement is uniform throughout. *Cf. MS Credit Ctr., Inc. v. Horton*, 926 So. 2d 167, 178 (Miss. 2006) (holding an arbitration provision was not inconspicuous when the arbitration agreement signed was at least as open and obvious as other contractual provisions).[17]

Nationwide's relies on Ms. White's testimony that no one went over the terms of the 2001 Agreement and she "don't read no contracts a lot of times." [79] at p. 29. However, this has no bearing on the adhesiveness of the contract. "Under Mississippi law . . . parties to a contract have an inherent duty to read the terms of a contract prior to signing; that is, a party may neither neglect to become familiar with the terms and conditions and then later complain of lack of knowledge, nor avoid a written contract merely because he or she failed to read it or have someone else read and explain it." *Bailey v. Est. of Kemp*, 955 So. 2d 777, 783 (Miss. 2007) (quoting *MS Credit Center, Inc. v. Horton*, 926 So. 2d 167, 177 (Miss. 2006).

---

[17] As to the assertion that Ms. White did not read or understand the terms of the 2001 Agreement, the Court finds that has no bearing on the adhesiveness of the contract. Additionally, under Mississippi law, a party has "an inherent duty to read the terms of a contract prior to signing." *Bailey v. Estate of Kemp*, 955 So. 2d 777, 783 (Miss. 2007) (citations omitted).

Also, as to Shirley's being the "weaker party," the Court declines to examine the relative "bargaining power" of Phillips-Doby/Interface versus Tammy White or her subjective sophistication. First, Ms. White did not sign the 2001 Agreement as a mere ordinary consumer against some corporate giant, but in a representative capacity for a business entity, Shirley's of Collins, LLC. A "commercial plaintiff is held to a higher standard than the ordinary consumer." *Brondes Ford, Inc. v. Habitec Sec.*, 38 N.E. 3d 1056, 1082 (Ohio Ct. App. 2015) (noting in a case involving unconscionability of a limitation of liability provision in security system agreement that courts rarely find unconscionability in a commercial setting). It would wreak havoc on commercial contracts if a company could avoid the terms of an arms-length transaction by selecting a subjectively unsophisticated individual to sign all of its agreements. This was an arm's length transaction between two business entities with equal bargaining power.

Finally, as to being the Agreement being presented on a take-it-or-leave-it basis, Nationwide argues that Ms. White was not advised that any of the terms were negotiable and she was not given an opportunity to negotiate. Nationwide also points to testimony from Paul Derrick, who signed the 2001 Agreement on behalf of Phillips-Doby, that he never negotiated any of the pre-printed terms in any agreement. [79] at p. 25. It seems this argument lends itself more to a procedural unconscionability argument. As the Mississippi Supreme Court recently stated, "a contract of adhesion renders the agreement *procedurally* unconscionable only where the stronger party's terms are unnegotiable and 'the weaker party is prevented by market factors, timing or other pressures from being able to contract with another party on more favorable terms or to refrain from contracting at all.'" *Virgil*, 296 So. 3d at 62 (quoting *East Ford*, 826 So. 2d at 716). However, here we are dealing with substantive unconscionability.

18

The Mississippi Supreme Court has also stated, "Unconscionability has been defined as 'an absence of meaningful choice on the part of one of the parties, together with contract terms which are unreasonably favorable to the other party.'" *Entergy Miss., Inc. v. Burdette Gin Co*., 726 So. 2d 1202, 1207 (Miss. 1998) (quoting *Bank of Indiana, Nat'l Ass'n v. Holyfield*, 476 F. Supp. 104, 109 (S.D. Miss. 1979)). A review of the *Entergy* case reveals that the "absence of meaningful choice" refers to whether the party had a meaningful choice in entering the contract in the first place. *See Pitts v. Watkins,* 905 So. 2d 553, 561 (Miss. 2005) (J. Dickinson, dissenting). As such, even assuming Shirley's was the weaker party, although the terms may have been unnegotiable, there is no evidence that Phillips-Doby was the only provider of security systems in the Collins area or that there was no other security system company that could have provided similar services with more favorable terms. *Cf.  Head v. U.S. Inspect DFW, Inc.,* 159 S.W.3d 731, 748 (Tex. App. 2005) (finding one of the considerations in determining unconscionability of limitation of liability provision in home inspection contract was that defendant was not the only home inspection service available to the plaintiff).

Regardless of whether the 2001 Agreement may have certain aspects of an adhesion contract, "finding a contract to be one of adhesion does not automatically mean that the contract or any provision thereof is substantively unconscionable." *Express Check*, 153 So. 3d at 608. Accordingly, the Court must still determine whether the terms, specifically the limitation of liability provision, is otherwise substantively unconscionable. To determine whether a contract is substantively unconscionable, the Court must "look within the four corners of an agreement in order to discover any abuses relating to the specific terms which violate the expectations of, or cause gross disparity between, the contracting parties." *Arrington*, 145 So. 3d at 614 (citing

*Moulds*, 14 So. 3d at 699); *see also Cleveland v. Mann*, 942 So. 2d 108, 114 (Miss. 2006) (noting that "[s]ubstantive unconscionability looks to the substantive terms of the agreement).[18]

In other words, the Court must determine whether the 2001 Agreement contains "oppressive contract terms such that 'there is a one-sided agreement whereby one party is deprived of all the benefits of the agreement or left without a remedy for another party's nonperformance or breach.'" *Arrington*, 145 So. 3d at 614. Looking to the 2001 Agreement, the Court cannot say its terms are unreasonably favorable to Interface so as to deprive Shirley's of the benefits or leave it without a remedy for Interface's nonperformance.

The limitation of liability provision at issue here states from the outset that the parties understand and agree that Interface "is not an insurer and that insurance, if any shall be obtained by [Shirley's] . . . ." [74-1]. The provision goes on to explain that the payments to be paid for the services are based solely on the value of the service and are "unrelated to the value of [Shirley's] property or the property of others located on [Shirley's] premises." *Id.* The parties agreed that it was "impractical and extremely difficult to fix the actual damages, if any, which may proximately result from failure to perform any of the obligations" for the reasons set forth therein.[19] *Id.* Thus, with such uncertainty, Interface would understandably desire to limit its liability to $250, which it did. This provision does not leave Shirley's without a remedy, as was the case in *Pitts v. Watkins,*

---

[18] "[P]rocedural unconscionability, [on the other hand], focuses on the circumstances surrounding the agreement's formation." *Cleveland*, 942 So. 2d at 114.

[19] The reasons listed as to why it is difficult to fix the actual damages are: (a) uncertain amount of value of Subscriber's property or the property of others kept on the premises which may be lost, stolen, destroyed, damaged or otherwise by occurrences which the system or services is designed to detect or avert: (b) The uncertainty of the response time of any police or fire department, should the police or fire department [be] dispatched as a result of a signal being received or an audible device sounding; (c) The inability to ascertain what portion, if any of the loss would be proximately caused by Contractors failure to perform or by failure of its equipment to operate; (d) The nature of the service to be performed by the Contractor.

905 So. 2d 553, 558 (Miss. 2005), where the losses sustained were uninsurable.[20] Shirley's could obtain insurance to cover any losses or damages sustained should the alarm system fail, which it did, and Nationwide paid over $4 million on Shirley's insurance claim. For all of the foregoing reasons, the Court finds that Nationwide has failed to carry its burden to show that the 2001 Agreement is substantively unconscionable.[21] Therefore, the Court will not invalidate the 2001 Agreement on such grounds.

### b. The 2001 Agreement's limitation of liability provision does not violate public policy.

Interface argues that "public policy considerations" support enforcing the limitation of liability provision. [75] at p. 13. Nationwide, on the other hand, Nationwide relies on two cases from Ohio that have rejected such policy considerations[22] and argues that Interface's public policy arguments also fail for the reason that there is no public policy in Mississippi, or anywhere else, that supports enforcing a limitation-of-liability provision found in a separate document that is not incorporated into the enforceable contract, such as the case here. [79] at pp. 27-29.

---

[20] Nationwide relies on the *Pitts* case, which involved a home inspection contract.[79] at p. 27. In that case, the plaintiffs, potential homeowners, contracted with a home inspector prior to purchase. 905 So. 2d at 554. After receiving the inspection report, the plaintiffs purchased the home. Once the plaintiffs discovered numerous defects in the house that should have been identified in the report, they sued the home inspector and sought damages for repairs made to the home. *Id.* at 554-555. The signed contract contained both a limitation of liability and an arbitration provision. *Id.* at 555. The court found both provisions unconscionable. *Id.* at 558. As to the limitation-of-liability clause, the court found it was unconscionable because it limited the inspector's liability to $265 while leaving the plaintiff's with no redress for the inspector's negligence, which caused them to incur $30,000 to $40,000 in damages. When coupled with having to proceed to arbitration where the filing fees was significantly more than the $265 the plaintiffs could recover, the court found the plaintiffs effectively without a remedy, and thus the provisions were unconscionable. *Id.* at 558. Here, there is no arbitration provision in addition to the limitation of liability, which coupled together as in *Pitts*, could lead to a different result. However, the more important distinction to be made is that the discovery of undetected existing defects in a home in *Pitts* is not an insurable occurrence, unlike the fire loss at issue in this case. Shirley's was not without a remedy here.

[21] Although this Court has cited it for legal propositions, the *Arrington* case upon which Nationwide relies is likewise factually distinguishable because, just as in *Pitts*, the court construed an arbitration clause together with the limitation/waiver of liability clause to find unconscionability. *See Arrington*, 145 So.3d at 616-617.

[22] Because the Court has found that under Mississippi law, the 2001 Agreement is not unconscionable, the Court declines to address the Ohio cases cited by Nationwide, wherein the courts declined to enforce liquidated damages/limitation of liability provisions in a security system contract on the basis of unconscionability.  As to any rejection of "policy considerations," Ohio appears to be in the minority, as will be shown *infra*, and Nationwide provides no support for any finding that Mississippi would follow Ohio law in that regard.

Aside from the fact that the Court has rejected Nationwide's assertion that the 2001 Agreement was not incorporated into the addenda, both parties seem to misapprehend the role of public policy. The burden is not on Interface to show that enforceability of the limitation of liability must *promote* public policy, although there is a public policy to promote freedom of contract.[23] Rather, in Mississippi, any presumption of enforceability of a contract may be overcome by showing that the contract would *violate* public policy. *See Whittington v. H.T. Cottam Co*., 130 So. 745, 749 (Miss. 1930) ("Contracts in violation of public policy are not voidable, but absolutely void . . . ."). Nationwide does not argue that the 2001 Agreement specifically violates public policy. Therefore, the Court need not address the issue, but in the interest of thoroughness, the Court will do so briefly.

"In determining whether contracts should be invalidated on the ground that they violate public policy, we have held that this should not be done unless the contract is prohibited by the Constitution, a statute, or condemned by some decision of the courts construing the subject matter." *Cappaert v. Junker*, 413 So. 2d 378, 380 (Miss. 1982). "The public policy of a state has reference to the interests of the people [such as] [t]he public health, the public morals, the public safety, the public welfare, the administration of public justice, and the like." *Whittington*, 130 So. at 752 (J. Griffith, dissenting). "The term 'public policy' embraces all acts or contracts which tend clearly to injure the public health, the public morals, the public confidence in the purity of the administration of the law, or to undermine that sense of security for individual rights which any citizen ought to feel." *Id.*

---

[23] This Court has recognized that there is a "now-dominant public policy that parties should be free to contract." *Natchez Reg'l Med. Ctr. v. Quorum Health Res., LLC*, 879 F. Supp. 2d 556, 562 (S.D. Miss. 2012) (citing *Kroger Co. v. Chimneyville Props. Ltd*., 784 F. Supp. 331, 349 (S.D. Miss. 1991)).

Here, the 2001 Agreement is not prohibited by the Constitution or any statute, and, as will be addressed *infra*, the subject matter of the contract at issue here has not been specifically condemned by any decision under Mississippi law. Additionally, neither party asserts, nor does the Court find, that any public interest is implicated in the 2001 Agreement. The Mississippi Supreme Court has enforced even exculpatory clauses that do not affect a public interest.[24] *See, e.g., Smith v. Smith*, 375 So. 2d 1041, 1042 (Miss. 1979) (enforcing an exculpatory clause in favor of a landlord in a commercial lease).[25] Because the limitation of liability clause in this case arises in a private commercial context, which implicates no public interest, and given the Mississippi Supreme Court's upholding of an exculpatory clause in *Smith*, which acted as a complete bar to recovery, the Court finds that the clause at issue here, which only limits liability, would not violate any public policy.[26]

### c. The Mississippi Supreme Court would enforce the limitation of liability provision.

The Mississippi Supreme Court and the Mississippi Court of Appeals have addressed the enforceability of exculpatory and limitation of liability clauses in a variety of contexts; however, based on the Court's own research and the lack of citation by either party in this case, it appears that no Mississippi court has addressed a limitation of liability clause in the context of liability for the installation, maintenance, monitoring, or performance of a burglar or fire alarm system. "When state law provides no definitive answers to the question presented, [the district court] must make

---

[24] The distinction between a "limitation of liability clause" and an "exculpatory clause" is that the former limits the amount of damages that may be recovered for the negligent acts of a party, whereas the latter totally exonerates a party from its future negligent conduct.

[25] *See also Chimneyville Properties*, 784 F. Supp. at 350 (finding by this Court that exculpatory clause in commercial lease relieving lessee of liability for damage to premises caused by fire or other insurable hazards was not void as to public policy and enforceable under Mississippi law).

[26] Courts from other jurisdictions have specifically held that limitation of liability provisions in alarm service contracts do not violate public policy. *See, e.g., Monitronics Int'l, Inc. v. Veasley*, 746 S.E.2d 793, 802 (Ga. Ct. App. 2013) (private contracts are not to be voided on public policy grounds except where the case is free from doubt and where an injury to the public interest clearly appears).

an educated *Erie* guess as to how the Mississippi Supreme Court would resolve the issue. . . . [The district court] may consult a variety of sources, including the general rule on the issue, decisions from other jurisdictions, and general policy concerns." *Quorum Health,* 879 F. Supp. 2d at 565 (quoting *Travelers Cas. & Sur. Co. of America v. Ernst & Young,* 542 F.3d 475, 483 (5th Cir. 2008) (internal citations and quotation marks omitted)).

While Mississippi has not yet ruled, many other courts around the country have.  For the reasons below, the Court finds that it is likely that if it were undisputed that the contract at issue was otherwise enforceable and applied to the transaction at issue, that the Mississippi Supreme Court would follow suit and find that the provision is valid and enforceable.

The Court agrees with Interface in its assertion that courts across the country have acknowledged the need for and validity of risk allocation provisions in fire and burglar alarm contracts, and both state courts and district courts have upheld limitation of liability provisions. *See, e.g., D.L. Lee & Sons v. ADT Sec. Sys., Mid-South, Inc*., 916 F. Supp. 1571, 1582-83 (S.D. Ga.  1995); *Steiner Corp. v. Am. Dist. Tel.,* 683 P.2d 435 (Idaho 1984); *Fox Alarm Co. v. Wadsworth*, 913 So. 2d 1070 (Ala. 2005), as modified on denial of reh'g (May 27, 2005); *Haspel v. Rollins Protective Serv., Inc*., 490 So. 2d 530 (La. Ct. App. 1986), writ denied, 496 So. 2d 326 (La. 1986); *Fox Elec. Co. v. Tone Guard Sec., Inc*., 861 S.W.2d 79 (Tex. Ct. App. 1993); *Cent. Alarm of Tucson v. Ganem*, 567 P.2d 1203, 1207 (Ariz. Ct. App. 1977); *Guthrie v. Am. Prot. Indus.*, 160 Cal. App. 3d 951, 954 (1984); *Fireman's Fund Ins. Co. v. Morse Signals Devices*, 151 Cal. App. 3d 681 (1984); *Cont'l Video Corp. v. Honeywell, Inc*., 422 So. 2d 35 (Fla. 3d DCA 1982); *Niccoli v. Denver Burglar Alarm, Inc.*, 490 P.2d 304, 306 (Colo. Ct. App. 1971).

Not only state courts and district courts enforce such provisions but also nine United States Circuit Courts of Appeals, including the Fifth Circuit, have considered the enforceability of

limitation of liability provisions in alarm/security company contracts and enforced them. *See, e.g.,
E. H. Ashley & Co., Inc. v. Wells Fargo Alarm Servs.*, 907 F.2d 1274, 1278-80 (1st Cir. 1990);
*Leon's Bakery, Inc. v. Grinnell Corp.*, 990 F.2d 44, 48-50 (2d Cir. 1993); *Krueger Assocs. v. Am.
Dist. Tel. Co.*, 247 F.3d 61 (3d Cir. 2001); *Gill v. Rollins Protective Serv. Co.*, 722 F.2d 55 (4th
Cir. 1983); *Robin Towing Corp. v. Honeywell, Inc.*, 859 F.2d 1218 (5th Cir. 1988) (applying
Louisiana law); *Spengler v. ADT Sec. Servs. Inc.,* 505 F.3d 456 (6th Cir. 2007); *Elsken v. Network
Multi- Family Sec. Corp.*, 49 F.3d 1470 (10th Cir. 1995); *D.L. Lee & Sons v. ADT Sec. Sys.*, 77
F.3d 498 (11th Cir. 1996).[27]

  In light of the number of state and federal court decisions that have enforced limitation of
liability provisions in the context presented here, and the reasoning stated in such decisions, the
Court finds that it is likely the Mississippi Supreme Court, if presented with the issue, would
follow suit, and Nationwide has presented no particular argument as to why it would not. When
it comes to enforcement in this context, the Mississippi Supreme Court would likely consider as
other courts have, and as the 2001 Agreement in this case states, that security system companies
are not insurers and, thus, have the contractual right to limit exposure to potentially exorbitant
casualty losses in a private commercial setting. *See, e.g., St. Paul Fire & Marine Ins. Co. v.
Guardian Alarm Co. of Michigan*, 320 N.W.2d 244, 247 (Mich. Ct. App. 1982) (finding
limitation of liability clause not unconscionable and is enforceable because defendant is not in
the insurance business—rather it provides an alarm service for a specific sum, which is not a
premium for theft insurance).

---

[27] The Court has also considered and reviewed at length the American Law Report Annotation: Liability of Person
Furnishing, Installing, or Servicing Burglary or Fire Alarm System for Burglary or Fire Loss, 37 A.L.R. 4th 47
(originally published in 1985), *superseded in part by* Annotation: Validity, Construction, and Application of
Exculpatory and Limitation of Liability Clauses in Burglary, Fire, and Other Home and Business Monitoring Service
Contracts, 36 A.L.R. 6th 305 (Aug. 01, 2008).

Additionally, the Court finds that cases decided by the Mississippi Supreme Court in other contexts further supports a finding that Mississippi's highest court would enforce such a provision. For example, as mentioned, in the *Smith* case the court upheld a completely exculpatory provision in a lease agreement between private commercial parties. 375 So. 2d at 1042. Likewise, in *Pitts*,[28] the reason the court did not enforce a limitation of liability clause in a home inspection contract was due to unconscionability because the defects discovered after purchasing the home left the homeowners without redress for their injuries. 905 So. 2d at 558. Again, that is not the situation here, and the provision at issue here is not unconscionable.

Finally, when it comes to limitation of liability clauses in general, as recognized by this Court over ten years ago, "Clauses which limit liability historically have been viewed with disfavor in Mississippi jurisprudence, but recently the Mississippi Supreme Court has expressed a willingness to validate such agreements based upon the "now-dominant public policy that parties should be free to contract." *Quorum Health*, 879 F. Supp. 2d 556, 562.[29]

---

[28] *See supra* n. 20.

[29] To the extent the parties have stated that in Mississippi, limitation of liability clauses are only enforceable "if they are fairly and honestly negotiated" and "understood by both parties," this statement of law did not originate as a specific holding in a case, but is a quote from 17 Am.Jur.2d Contracts § 297 n. 74 (1991). In *Farragut v. Massey*, the Mississippi Supreme Court quoted this source when analyzing and declining to enforce a release executed between two parties, relating to damages arising from a mineral lease when, due to ambiguous language in the release, the court found a lack of understanding as to the scope of such release. 612 So. 2d 325, 329-330 (Miss. 1992). Cases relying on this proposition of law often involve releases or waivers, which results in full absolution of liability. *See, e.g., Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc.*, 857 So. 2d 748, 754 (Miss. 2003); *Quinn v. Mississippi State Univ.*, 720 So. 2d 843, 851 (Miss. 1998); *Rigby v. Sugar's Fitness & Activity Ctr.*, 803 So. 2d 497, 498 (Miss. Ct. App. 2002). For example, in *Turnbough v. Ladner*, a diving instructor utilized a blanket release to attempt to escape liability from negligence relating to personal injuries suffered by a participant in a scuba diving exercise. 754 So. 2d 467, 468 (Miss. 1999). The difficulty with releases, as the court notes *Turnbough*, is that a release could encompass negligent acts not contemplated or understood by the parties. *Id.* at 469. This case does not involve a broad fully exculpatory release or any negligent acts not understood or contemplated by the parties. This is a limitation that the parties agreed was necessary due to a number of factors, namely the uncertain value of the Shirley's property that may be stolen or damaged "by occurrences which the system or service was designed to detect or avert" and the inability to ascertain what portion of the loss would be proximately caused by Interface's failure to perform or failure of the equipment. Releases also involve complete absolution for liability for the acts of one party that are likely be a direct proximate cause of the injury. There can be no dispute here that it was not Interface's negligence that specifically caused the fire but the action of the vandals. That presents a far different situation than one of the parties to a contract, seeking to be fully absolved of liability for injuries directly caused by its negligence, as in *Turnbough*.

Based on the foregoing, the Court finds that the limitation of liability clause in the 2001 Agreement is fully enforceable and that the Mississippi Supreme Court would agree.

### 3.  The limitation of liability provision limits Interface's liability to $250 on Nationwide's claims.

Interface argues that Paragraph 9 of the 2001 Agreement limits Interface's liability for the loss at issue here, regardless of fault, and assuming Interface is assessed liability, its liability is capped at $250. [75] at p. 9. Interface seems to assume that "all liability" is capped, as it does not set forth how the language of the provision applies to each of Nationwide's claims.[30] Notwithstanding, it is incumbent on the Court to examine the language of the limitation of liability to determine which of Nationwide's claims are subject to limited recovery.

### a.  The provision applies to all negligence claims, including gross negligence.

Paragraph 9 of the 2001 Agreement states, in relevant part, as follows:

> Subscriber understands and agrees that if Contractor should be found liable for loss or damage due from *a failure of Contractor to perform any of the obligations herein, including but not limited to installation, maintenance, monitoring or service or the failure of the system or equipment in any respect whatsoever,* Contractor's liability shall be limited to Two Hundred Fifty ($250.00) Dollars, as liquidated damages and not as a penalty and this liability shall be exclusive and *that the provision of this Section shall apply if loss or damage, irrespective of cause or origin, results* directly or indirectly to persons or property from performance or non-performance of the obligations imposed by this contract, or *from negligence, active or otherwise*, its agents, assigns or employees.

[74-1] (emphasis added). First, clear language states Interface's liability must result "from a failure of [Interface] to perform" any of its contractual obligations, including "installation, maintenance, monitoring or service." *Id.* Nationwide's claims clearly relate to installation, maintenance, monitoring and service, but Nationwide did not plead a breach of contract claim. However, because

---

[30] Nationwide presents no argument as to how the scope of the provision affects its claims, save for the misrepresentation claim, which will be addressed *infra*.

the provision goes on to state that "this Section (i.e., the limitation of liability provision) shall apply if loss or damage, irrespective of cause or origin, results . . . from negligence, active or otherwise," the Court finds that the provision applies to any negligence claim, including negligent misrepresentation, and that the phrase, *active or otherwise*, would encompass gross negligence. *See Great N. Ins. Co. v. ADT Sec. Servs., Inc.*, 517 F. Supp. 2d 723 (W.D. Pa. 2007) (holding that reference to "negligence, active or otherwise" in limitation of liability provision applied to acts of gross negligence).

Nationwide argues only briefly that, even if the 2001 Agreement it enforceable, "its limitation-of-liability provision does not exempt Interface from liability for grossly negligent conduct." [79] at p. 31. In support of its position, Nationwide provides no substantive legal argument, but only a single quote from the *Quorum Health* case decided by this Court and a 1984 case from California.[31] While recognizing that such a clause may violate a public policy of California, the Court finds Nationwide's argument unpersuasive.

First, the Nationwide's reliance on the quote from *Quorum Health* is misplaced. This Court in *Quorum Health* stated, "A term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy." 879 F. Supp. 2d at 569. However, this case does not include a blanket exculpatory clause, which would completely exempt Interface from liability, but rather a clause limiting liability for the specific reasons set forth in the 2011 Agreement. Also, the statement was merely a quote from Restatement (Second) of Contracts § 195, which, although this Court commented that it was "an authority that has proven persuasive to the Mississippi Supreme Court in the past," the Court today is unable to find any Mississippi Supreme Court citing to Restatement (Second) of Contracts § 195, much

---

[31] Nationwide cites *Fireman's Fund Ins. Co. v. Morse Signals Devices*, 151 Cal. App. 3d 681 (Cal. 1984).

less relying on it for a holding. Moreover, when the Court quoted the Restatement, it was mere dicta because it had already found the entire exculpatory clause in that case unenforceable as a matter of Mississippi law. 879 F. Supp. 2d at 569. The Court was merely expressing its skepticism at a parties' attempted waiver of "punitive damages." *Id*.

Finally, as we have already discussed, for a contract to violate public policy, a public interest must be implicated. In *Quorum Health*, this Court observed, "the Mississippi Supreme Court has focused specifically on how the public, which is protected by a host of judicially-imposed common-law legal duties but is not a "party" to the contract, would be impacted by one private party's attempt to limit its liability to another private party." *Id*. at 565 (citing *Cappaert*, 413 So. 2d at 381). Here, the Court has already found that the 2001 Agreement affects no public interest, and Nationwide fails to address any public interest that would be affected by limiting liability for gross negligence in general. Nationwide has failed to provide sufficient legal support for its position. For all of these reasons, the Court is not convinced that the limitation of liability is not applicable to claims of gross negligence.

### b. The provision applies to the warranty claims.

Also, Nationwide also pled two breach of warranty claims and argues that the dispute stems from the failure of Interface's security system to operate on the night in question, including the failure to notify Interface, the local authorities, and/or Shirley's that a burglary was in progress. [79] at p. 33. The Court agrees that Nationwide's Complaint is clear that its warranty claims are based upon the "defective nature of the Security System" and the security system being "defective and susceptible to failure." [1] at ¶¶ 22-31. Because the plain language of the provision also states that Interface's liability must result from either Interface's failure to perform any of the contractual

obligations "or the failure of the system or equipment in any respect whatsoever" the limitation of liability would also apply to Nationwide's warranty claims.

           **c.**   **The provision applies to the intentional misrepresentation claim.**

However, as to the intentional misrepresentation claim, Nationwide alleged that "Interface represented that the Security System services included twenty-four (24) hour monitoring and that Interface would notify Shirley's as well as the appropriate authorities if an alarm event such as a burglary occurred." [1] at ¶ 18. Interface argues that this allegation shows that the misrepresentation claim is based on Interface's alleged failures in monitoring and reporting alarm events to the appropriate authorities, and thus, it is covered by the limitation of liability provision. [75] at p. 18. Nationwide argues that, although the limitation of liability provision would apply to Interface's failure to perform any contractual duties, the intentional misrepresentation claim is not based on a breach of the contract or otherwise contract dependent. [79] at p. 34.

Based on the allegations, the Court finds the provision would cover the intentional misrepresentation claim. The provision applies not only to any failure to perform contractual duties but also to "failure of the system or equipment in any respect whatsoever." [74-1]. The alleged representation would seem to be false only if Interface failed to monitor or notify/report (a contractual obligation) or the system failed and did not monitor or report. Either way, it would be covered by the provision. Therefore, the Court finds that the limitation of liability provision also applies to the intentional misrepresentation claim.

## III. CONCLUSION

To the extent the Court has not addressed any of the parties' arguments, it has considered them and determined that they would not alter the result. Therefore, it is hereby ORDERED that Interface Security System's Motion for Summary Judgment [74] is granted in part and denied in

part. The Motion is GRANTED in so far as the Court finds that the 2001 Agreement is a valid and enforceable contract in effect at the time of the fire and that the limitation of liability provision contained therein is likewise valid and enforceable and applicable to all of Nationwide's claims. As to each of Interface's alternative theories for summary judgment, the Court declines to address such grounds, and the Motion is DENIED in that respect. The parties shall now proceed with this case accordingly.

SO ORDERED AND ADJUDGED this 9th day of February 2023.


/s/ Keith Starrett _
KEITH STARRETT
UNITED STATES DISTRICT JUDGE